ROBERT C. SCHUBERT S.B.N. 62684
WILLEM F. JONCKHEER S.B.N. 178748
MIRANDA P. KOLBE S.B.N. 214392
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Telephone:      (415) 788-4220
Facsimile:      (415) 788-0161

Counsel for Derivative Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| CHRISTOPHER HAMILTON and DAVID HAMILTON, derivatively, on behalf of ADVANCED MICRO DEVICES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> W. MICHAEL BARNES, RICHARD A. BERGMAN, JOHN E. CALDWELL, HENRY WK CHOW, BRUCE L. CLAFLIN, NICHOLAS M. DONOFRIO, JOHN R. HARDING, RORY P. READ, THOMAS J. SEIFERT and LISA T. SU, <br><br> Defendants, <br><br> - and - <br><br> ADVANCED MICRO DEVICES, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACHES OF FIDUCIARY DUTY, UNJUST ENRICHMENT, AND WASTE OF CORPORATE ASSETS** <br><br> <u>JURY TRIAL DEMANDED</u> |

*SCHUBERT JONCKHEER & KOLBE LLP*
*Three Embarcadero Center, Suite 1650*
*San Francisco, CA 94111*
*(415) 788-4220*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, by their undersigned attorneys, for their verified shareholder derivative complaint, allege upon information and belief, except as to allegations contained in paragraph 14 for Plaintiff Christopher Hamilton and paragraph 15 for Plaintiff David Hamilton, which are based upon each such Plaintiff's personal knowledge, as follows:

## NATURE OF THE ACTION

1.      This is a  shareholder derivative action brought on behalf of nominal defendant Advanced Micro Devices, Inc., a Delaware corporation ("AMD" or the "Company"),  against certain of its officers and directors, seeking to remedy violations of state law, including breaches of fiduciary duties, unjust enrichment, and waste of corporate assets.

2.      Nominal Defendant AMD is one of the world's largest semiconductor companies. It designs, develops and sells microprocessors and accelerated processing units (APUs) for desktop personal computers, notebooks, tablets, hybrids, servers and embedded products.

3.      During the period April 4, 2011 through October 18, 2012 (the "Relevant Period"), the Individual Defendants identified herein caused AMD to issue numerous false and misleading statements concerning the Company's first generation APU, marketed as the "Llano."  The Llano contains a series of 64-bit microprocessors designed to act as a central processing unit (CPU) and graphics accelerator (GPU) on a single silicon chip. AMD touted the Llano as the "next generation of computing," declaring it "an inflection point for AMD and … perhaps the industry's biggest architectural change since the invention of the microprocessor."

4.      During the Relevant Period, the Individual Defendants repeatedly caused AMD to represent that there was "strong" and "significant" interest in and demand for the Llano.  Further, the Individual Defendants caused AMD to falsely and misleadingly represent that the demand for the Llano was "higher than anticipated," concealing from investors that the Llano demand was actually much weaker than expected.

5.      During the Relevant Period, the Individual Defendants also concealed problems with the Llano production process and product yield. The manufacturing of APUs is an intricate and complex process. As part of the process, a fabrication plant must create a silicon wafer to house the transistor chips that comprise the microprocessors. During the Relevant Period there

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

were significant delays with the production of these silicon wafers. By the time the wafer production issues were remedied, AMD had announced its plan to launch its second generation APU. At this time, customers knew that an upgraded product was only months away, and as a result, demand for the Llano APUs suffered dramatically.

6.      Despite these issues with the Llano production and demand, the Individual Defendants repeatedly misled investors by touting positive projections for the Llano.

7.      In July 2012 the Individual Defendants could no longer conceal the underwhelming demand for the Llano. In a series of announcements, AMD revealed decreases in quarterly revenue, decreases in gross margins, and a $100 million write-down of the Llano inventory as unsalable. AMD's stock price fell sharply in response to these announcements. By the time the truth regarding the Llano was revealed to investors, AMD's market capitalization fell to approximately $1.5 billion, from a high of $5.77 billion, losing nearly 74% of its value.

8.      The Company and several of the Individual Defendants have been named in a class action complaint (the "Class Complaint") alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder. *See Babak Hatamian et al. v. Advanced Micro Devices, Inc., et al.*, No. 14-cv-00226-YGR (N.D. Cal. filed Jan. 15, 2014). On March 31, 2015, U.S. District Judge Yvonne Gonzalez Rogers denied AMD's motion to dismiss the class action, finding that certain Individual Defendants knowingly made false and misleading statements regarding the supply and production of the Llano and "exhibited an extreme departure from the standards of ordinary care intended to fairly inform reasonable investors."

9.      Plaintiffs, each an AMD shareholder, now bring suit on behalf of AMD to remedy and redress the damage done to the Company by the Individual Defendants.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between each plaintiff and each defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction by District courts in this District permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in the Northern District Court of California in accordance with 28 U.S.C. § 1391 because: (i) AMD maintains its principal executive offices in the Northern District of California; (ii) one or more of the defendants either resides in or maintains offices in the Northern District of California; and (iii) a substantial portion of the acts and transactions giving rise to the violations of law alleged herein occurred in the Northern District of California.

## INTRADISTRICT ASSIGNMENT

13.     A substantial portion of the acts and transactions giving rise to the violations of law alleged herein occurred in the County of Santa Clara, and as such, this action may be properly assigned to the San Jose division of this Court. Plaintiffs intend to file an Administrative Motion to Consider Whether Cases Should be Related, relating this action to *Babak Hatamian et al. v. Advanced Micro Devices, Inc., et al.*, No. 14-cv-00226-YGR (N.D. Cal. filed Jan. 15, 2014), pursuant to Civil L.R. 7-11.

## PARTIES

**Plaintiff Christopher Hamilton**

14.     Plaintiff Christopher Hamilton is a current AMD shareholder. Mr. Christopher Hamilton held AMD shares during the Relevant Period and has continuously held AMD shares since the Relevant Period.  Plaintiff Christopher Hamilton is a citizen of the State of Georgia.

**Plaintiff David Hamilton**

15.     Plaintiff David Hamilton is a current AMD shareholder. Mr. David Hamilton held AMD shares during the Relevant Period and has continuously held AMD shares since the Relevant Period. Plaintiff David Hamilton is a citizen of the State of New Jersey.

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

**Nominal Defendant AMD**

16.     Nominal defendant AMD is a Delaware corporation with its principal executive offices located at One AMD Place, Sunnyvale, CA 94088.  AMD is a global semiconductor company that develops computer processors and related technologies for business and consumer markets. AMD is a citizen of the State of California. AMD's shares are publicly traded on the NASDAQ under the stock symbol AMD. As of February 19, 2015, 777.74 million shares were issued and outstanding.

**Individual Defendants**

17.     Defendant Rory P. Read served as AMD's Chief Executive Officer, President and member of the Company's Board of Directors from August 2011 to October 2014. Defendant Read is named as a defendant in the Class Complaint. Defendant Read knowingly, recklessly or with gross negligence made improper statements in the Company's press releases, public filings, and conference calls concerning the Llano production, inventory, demand and financial projections. Mr. Read is a citizen of the State of Texas.

18.     Defendant Dr. Lisa Su is AMD's current President, Chief Executive Officer and a member of the Company's Board of Directors. Prior to her current position with the Company, Dr. Su served as the Company's Chief Operating Officer. During part of the Relevant Period defendant Su served as Senior Vice President and General Manager, Global Business Units of AMD. Dr. Su is also named as a defendant in the Class Complaint.  Defendant Su knowingly, recklessly or with gross negligence made improper statements in the Company's press releases, public filings, and conference calls concerning the Llano production, inventory, demand and financial projections. Dr. Su is a citizen of the State of California.

19.     Defendant Thomas J. Seifert served as AMD's Chief Financial Officer and Chief Accounting Officer from October 2009 until September 2012. In addition, Defendant Seifert served as AMD's interim Chief Executive Officer from January 2011 to August 2011. Mr. Seifert is also named as a defendant in the Class Complaint. Defendant Seifert knowingly, recklessly or with gross negligence made improper statements in the Company's press releases, public filings,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                   4

and conference calls concerning the Llano production, inventory, demand and financial projections. Mr. Seifert is a citizen of the State of California.

20.     Defendant Richard A. Bergman served as Senior Vice President and General Manager of AMD's Product Group from May 2009 to September 2011. Defendant Bergman is named as a defendant in the Class Complaint. Defendant Bergman knowingly, recklessly or with gross negligence made improper statements in the Company's conference calls and at events for analysts, investors, and the media concerning the Llano production, inventory and demand. Mr. Bergman is a citizen of the State of California.

21.     Defendants Read, Su, Seifert and Bergman are sometimes collectively referred to herein as the "Officer Defendants."

22.     Defendant Bruce Claflin is the current Chairman of AMD's Board of Directors. Mr. Claflin was first appointed as AMD's Chairman of the Board in March 2009. In January 2011, Mr. Claflin was appointed as AMD's nonemployee Executive Chairman of the Board. He held that position until August 2011, when he resumed acting as the Chairman of the Board. Mr. Claflin served as the Chair of the Nominating and Corporate Governance Committee during the Relevant Period. Defendant Claflin failed to monitor and correct materially false and misleading statements and omissions regarding the Llano made by Officer Defendants. Mr. Claflin is a citizen of the State of California.

23.     Defendant W. Michael Barnes has served as a member of AMD's Board of Directors since 2003. Mr. Barnes served as the Chair of the Company's Audit and Finance Committee, as well as a member of the Company's Nominating and Corporate Governance Committee, during the Relevant Period. Defendant Barnes failed to monitor and correct materially false and misleading statements and omissions regarding the Llano made by Officer Defendants. Mr. Barnes is a citizen of the State of California.

24.     Defendant John E. Caldwell has served as a member of AMD's Board of Directors since 2006. Mr. Caldwell served as a member of the Company's Audit & Finance Committee during the Relevant Period until May 2011.  Throughout the Relevant Period, Mr. Caldwell served on the Company's Nominating and Corporate Governance Committee. Defendant Caldwell failed

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

to monitor and correct materially false and misleading statements and omissions regarding the Llano made by Officer Defendants. Mr. Caldwell is a citizen of Canada.

25.     Defendant Henry WK Chow has served as a member of AMD's Board of Directors since February 2011. Mr. Chow has served as a member of the Company's Audit and Finance Committee since May 2011, and as a member of the Company's Nominating and Corporate Governance Committee since March 2011. Defendant Chow failed to monitor and correct materially false and misleading statements and omissions regarding the Llano made by Officer Defendants. Mr. Chow is a citizen of China.

26.     Defendant Nicholas M. Donofrio has served as a member of AMD's Board of Directors since 2009. Mr. Donofrio is the Chair of the Company's Innovation and Technology Committee.  During the Relevant Period, Mr. Donofrio was a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. Defendant Donofrio failed to monitor and correct materially false and misleading statements and omissions regarding the Llano made by Officer Defendants. Mr. Donofrio is a citizen of New York.

27.     Defendant John R. Harding has served as a member of AMD's Board of Directors since August 2012.  He was appointed to the Company's Nominating & Corporate Governance Committee in August 2012 and continues to serve on that Committee.  Mr. Harding was appointed to the Company's Audit & Finance Committee in September 2012, and remained on that Committee for the duration of the Relevant Period.  Mr. Harding is a member of the Company's Innovation and Technology Committee.  Defendant Harding failed to monitor and correct materially false and misleading statements and omissions regarding the Llano made by Officer Defendants.  Mr. Harding is a citizen of California.

28.     The Defendants identified in paragraphs 18 and 22-27 are referred to herein as the "Director Defendants."

29.     Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

30.     Each of the Individual Defendants, by virtue of his or her AMD management, executive, and/or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto.  The Individual Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial results of AMD.  The Individual Defendants were required to supervise the preparation of AMD's public filings and approve any reports, such as press releases and SEC filings, concerning AMD's financial condition.  The Individual Defendants were prohibited from engaging in unlawful corporate conduct, such as violations of the laws, rules, and regulations applicable to AMD and its business.

31.     Each of the Individual Defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements alleged herein, and/or was aware that the false and misleading statements were being issued regarding the Company's Llano product and approved or ratified these statements.

32.     Because of each of the Individual Defendants' positions with AMD, each knew and had access to non-public information about the business of AMD, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided in connection therewith.  The Individual Defendants knew, or recklessly disregarded, that the statements about AMD's business, its financial condition, and Llano product were false and misleading when made.  The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding AMD.

33.     Because of their positions and access to material non-public information, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein

Schubert Jonckheer & Kolbe LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were false and misleading.

34.   Because of their positions of control and authority as directors and/or officers of AMD, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.   To discharge their duties as corporate fiduciaries, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of AMD's business and financial affairs.  By virtue of such duties, the Individual Defendants were required, among other things, to:

(a)   manage, conduct, supervise, and direct the business affairs of AMD in accordance with the laws of the State of California, federal law, state and federal rules and regulations, and AMD's charter and bylaws;

(b)   neither violate nor knowingly permit any officer, director, or employee of AMD to violate applicable federal laws, rules, and regulations and state law;

(c)   ensure that AMD and each of its officers, directors and employees did not make false or misleading statements about the supply, demand or financial projections of the Company's products;

(d)   maintain and implement adequate and functioning systems of corporate controls, such that AMD's public filings and other publicly disclosed information would be accurate; and

(e)   remain informed as to the status of AMD's operations, and upon receipt of notice or information of imprudent or unsound business practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with state and federal securities laws.

## FACTS

36.   AMD is a global semiconductor company that develops computer processors and related technologies for commercial and consumer markets. It offers x86 microprocessors as

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

standalone devices or incorporated as an accelerated processing unit (APU), embedded microprocessors, and chipsets for desktop and mobile devices, including personal computers, tablets, and professional workstations and servers. AMD also produces graphics, video, and multimedia products for desktop and mobile devices, including PCs, tablets, and professional workstations and servers, as well as technology for game consoles.

37.     During the Relevant Period, the Company operated through two business segments: Computing Solutions and Graphics Solutions. Computing Solutions was comprised of x86 microprocessors, as standalone devices or as incorporated as an APU, chipsets, embedded processors and dense servers. For fiscal year 2011, revenue for the Computing Solutions segment was approximately $5 billion, about 76% of total revenue. Graphics Solutions was comprised of GPUs, including professional graphics, semi-custom system on chip products, revenue from development services, and royalties for game consoles. For fiscal year 2011, revenue for the Graphics Solutions segment was approximately $1.5 billion, the remaining 24% of total revenues.

38.     On March 2, 2009, together with certain partners and investors, AMD formed GLOBALFOUNDRIES, Inc. ("GF"), a manufacturing joint venture that manufactured semiconductor products and provides foundry services to AMD. AMD subsequently entered into a Wafer Supply Agreement ("WSA") with GF, which governed the terms by which AMD purchased chips manufactured by GF. Pursuant to the WSA, AMD was required to purchase all of its microprocessor unit and APU product requirements from GF, with certain limited exceptions. AMD's ownership interest in GF has been reduced since 2009, but at relevant times AMD remained highly dependent on GF for the components it needed to create its APUs.

39.     According to the Company's SEC filings concerning the Relevant Period, AMD's microprocessor customers consisted primarily of original equipment manufacturers ("OEMs"), original design manufacturers ("ODMs"), system builders, and independent distributors in both domestic and international markets. ODMs provide design and/or manufacturing services to branded and unbranded private label resellers, OEMs and system builders. These disclosures emphasized the importance of timely delivery and performance, due to product cycles and the lead time necessary for customers to integrate AMD's microprocessors:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        9

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Our success depends to a significant extent on the development, qualification, implementation and acceptance of new product designs and improvements that provide value to our customers. <u>Our ability to develop, qualify and distribute new products and related technologies to meet evolving industry requirements, at prices acceptable to our customers and on a timely basis are significant factors in determining our competitiveness in our target markets. If we fail to or are delayed in developing, qualifying or shipping new products or technologies, we may lose competitive positioning, which could cause us to lose market share and require us to discount the selling prices of our products.</u> [emphasis supplied].

<u>Delays in developing, qualifying or shipping new products can also cause us to miss our customers' product design windows. If our customers do not include our products in the initial design of their computer systems, they will typically not use our products in their systems until at least the next design configuration.</u> The process of being qualified for inclusion in a customer's system can be lengthy and could cause us to further miss a cycle in the demand of end-users, which also could result in a loss of market share and harm our business. [emphasis supplied].

40.      In 2011, after many years of research and development, AMD launched a group of chips combining its CPU and GPU processing units onto a single chip – the APU. Among these new products were chips codenamed Llano, which were designed mainly for mainstream desktop and mobile platforms. According to published reports in the summer of 2010, the Llano was originally set to be released in 2010, but there had been problems with the yield curve, meaning that the percentage of usable chips produced at the foundry (GF) was too low. Nonetheless, according to the Company's then-CEO, the Llano was still set for release in the first half of 2011.

41.      In a press release dated January 4, 2011, AMD described its new fusion microprocessors, including the Llano, as "quite simply, the greatest advancement in processing" in forty years. In April of 2011, it was disclosed that the yield curve on the Llano had improved, and Defendant Seifert was quoted as saying that yield was now "in line with our expectations" and that the products had begun shipping to OEMs. Seifert was also quoted as stating that the "32 nanometer" was "where we want it to be" and that the foundry issues were "behind us."

42.      On April 21, 2011, the Company issued a press release reporting revenue of $1.61 billion, and net income of $510 million, or $0.68 per share for the first quarter of 2011. The press release also provided revenue guidance for the 2011 second quarter, stating that the Company expected revenue to be flat to slightly down. Defendant Seifert is quoted in the press release,

touting "strong" demand for the APUs and stating that Llano was shipping for revenue ahead of the formal launch. AMD also published a CFO Commentary, which emphasized that Llano was currently shipping and "adding" to the Company's "momentum." In an earnings call, defendant Bergman affirmed the Llano ramp to launch in the second quarter, "our key for Llano is to hit the critical cycle in the industry, which is BTSC, or the back-to-school cycle. So we have broad-based OEM platform adoption for that timeframe, and we're well positioned to take advantage of that cycle," while defendant Seifert denied any product yield issue: "We think we have ample [] product available in the second quarter."  [emphasis supplied]

43.    In a June 14, 2011 press release officially launching Llano, defendant Bergman stated that Llano would "usher[] in [the] next generation of computing" and represented an "inflection point for AMD and is perhaps the industry's biggest architectural change since the invention of the microprocessor." The Llano would bring the "arrival of brilliant all-new computing experiences, and enables unprecedented graphics and video performance in notebooks, and PCs."

44.    On July 21, 2011, the Company issued a press release reporting revenue of $1.57 billion, and net income of $61 million, or $0.08 per share for the second quarter of 2011. The press release also provided guidance for the third quarter, noting that "AMD expects revenue to increase 10 percent, plus or minus 2 percent, sequentially for the third quarter of 2011." An accompanying CFO Commentary stated that "as the Llano APU penetration continues, we expect to increasingly participate in mainstream and performance notebook market segments." In an earnings call, defendant Seifert reiterated Llano's purportedly strong debut.

45.    On August 8, 2011, AMD representatives attended the Pacific Crest Securities Technology Leadership Forum, where they further touted the anticipated Llano success and denied any issues with GF production. At the conference, defendant Bergman stated that "GLOBALFOUNDRIES is very important to us. They manufacture Llano processors, soon to be rolled out Orochi processors, as well as very prominently in our roadmap…. So as we go forward, no big change to our roadmap to announce typically. We could do that at our Analyst Meeting in early November, but we're well positioned there." defendant Bergman's misleading statement fails

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

to identify the GF production issues, which significantly impacted the Llano yield and AMD roadmap.

46.     AMD continued highlighting strong interest and demand for the Llano APUs as the year continued. On October 27, 2011, AMD released its third quarter financial results for the period ended October 1, 2011. The Company reported revenue of $1.69 billion, and net income of $97 million, or $0.13 per share. The press release also noted AMD's then-current outlook of an increase of 3% sequentially for revenue for the 2011 fourth quarter. AMD touted the strong adoption of its APUs and stated that "[d]espite supply constraints [AMD] saw double digit revenue and unit shipment growth in emerging markets like China and India . . . ."

47.     AMD held an earnings conference call following the third quarter 2011 earnings announcement. During the call, defendants Read and Seifert acknowledged the prior foundry delays at GF, but made very positive statements about AMD's 32nm processors, including the Llano APU. Defendant Read noted that while there were manufacturing challenges for the Llano APU, "demand was strong and interest in our products is significant." Defendants Read and Seifert explained that they were focused on the resolving the foundry issues. However, defendant Seifert reiterated that "we guided revenue up quarter over quarter with a midpoint of 3%, and we also said that this will include a significant increase of our shipments on 32nm and Llano."

48.     On November 9, 2011, AMD filed its Form 10-Q for the third quarter ended October 1, 2011. This Form 10-Q acknowledged "challenges" and "supply shortages" based on GF's production problems, but reassured shareholders that the Company was allocating the necessary resources to 32nm products, and away from other products:

> We also experienced challenges during the third quarter of 2011, particularly related to supply shortages of certain microprocessor products manufactured using the 32nm and 45nm technology nodes, which adversely impacted our ability to fulfill customer demand. Specifically, GLOBALFOUNDRIES Inc. (GF) experienced yield and other manufacturing difficulties related to 32nm wafer fabrication, resulting in lower than expected supply of AMD Fusion A-Series APUs, codenamed Llano, to us. We also experienced supply constraints for our 45nm microprocessor products due to complexities related to the use of common tools across both the 32nm and 45nm technology nodes and because we made the decision to shift volume away from products manufactured using the 45nm technology node in order to obtain additional Llano products. We continue to work closely with our foundry partner to improve yields. However, we expect that during

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

the fourth quarter of 2011, we will continue to shift volume away from products manufactured using the 45nm technology node in order to obtain additional Llano products, and therefore, we expect that we will continue to experience some supply constraints for our 45nm microprocessor products during the fourth quarter of 2011, which would have an unfavorable impact on gross margin.

49.     Furthermore, AMD suggested in the Risk Factor section of the Form 10-Q that supply constraints for the Llano would be easing soon, and only affecting 45nm processors going forward:

We cannot assure you that these manufacturers or our other third party manufacturing suppliers will be able to meet our near-term or long-term manufacturing requirements. For example, in the third quarter of 2011, GF experienced yield and other manufacturing difficulties related to 32nm wafer fabrication, resulting in lower than expected supply of Llano products to us, which adversely impacted our revenues and gross margins. . . . We expect that during the fourth quarter of 2011, we will continue to shift volume away from products manufactured using the 45nm technology node in order to obtain <u>additional Llano products</u>, and therefore, we expect that we will continue to experience some supply constraints <u>for our 45nm microprocessor products</u> during the fourth quarter of 2011. [emphasis supplied].

50.     On January 24, 2012, AMD issued a press release announcing its financial results for its fiscal 2011 fourth quarter and fiscal year ended December 31, 2011. The Company reported quarterly revenue of $1.69 billion, and a net loss of $177 million, or $0.24 per share. For the year, the Company reported revenue of $6.57 billion, and net income of $491 million, or $0.66 per share. Regarding its then-current outlook for revenue, the release noted an expected decrease of 8% for the first quarter of 2012, plus or minus 3%. The press release also emphasized the record annual notebook revenue from shipment of more than thirty million APUs in 2011.

51.     AMD held an earnings conference call following the fourth quarter and year-end 2011 announcement. In the call, defendant Read highlighted the strong demand for the Llano APU, and stated that AMD had been "intensely focused" on execution and that there had been "steady improvement" in fixing the production problems. He further touted an 80% quarterly increase in Llano deliveries, and a substantial contribution of Llano to revenue. Defendant Seifert added that "we are not going to be supply constrained in the [2012] first quarter."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          13

1

2

3

4

5

6

7

8

9

10

11

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

52.     Defendants Read and Seifert further boasted of strong demand for APUs and the Llano. Defendant Read touted "record APU unit shipments for the quarter" and that "APU momentum continues to accelerate." Read expressed "no doubt that the customer acceptance of our APU architecture is quite strong. We've now shipped over 30 million of these APUs to date. And we're seeing a strong uptake in terms of that architecture and what it means to the customer. They are looking for a better experience. I think that's a key reason why we've seen the momentum in our business and the ability to deliver on that."

53.     On February 2, 2012, AMD held a 2012 Financial Analyst Day webcast with analysts and investors. During the webcast, defendant Su touted "great customer reception" of AMD's APUs, and declared that momentum for shipments of APUs was continuing to grow:

> So, in 2011, we launched the AMD APUs, and it's been fantastic. You heard it from Rory. We'll say it many, many times today, first to introduce heterogeneous computing in the market place. It had great customer reception. The performance of the Llano is 3x what a typical general purpose processor would do and that's the power bringing the processor and the graphics capability together. When you look at the roadmap, and I'm going to talk to you about the roadmap for second generation and third generation APUs, we will take that in the mainstream to 1 teraflop and it's really just a couple of years away.

> The thing about APUs is where do we think it can go in the market and if you look at the market adoption for this technology, it's been fantastic. We've shipped over 30 million APU units to date and if you look at it just started shipping in fourth [quarter] 2010, it really has made tremendous progress. 11 of the top 12 OEMs are shipping AMD APUs and we see that continuing to grow and the momentum continuing to grow into 2012 and 2013. [emphasis supplied]

54.     On February 24, 2012, AMD filed its Form 10-K for the period ending December 31, 2011. The Form 10-K again touted APU and particularly Llano demand:

> Computing Solutions net revenue of $5.0 billion in 2011 increased 4% compared to net revenue of $4.8 billion in 2010, primarily as a result of a 16% increase in unit shipments partially offset by an 11% decrease in average selling price. The increase in unit shipments was attributable to an increase in unit shipments of our microprocessors, including APU products for mobile devices, as well as our chipset products. Unit shipments of our microprocessors, including APU products for mobile devices increased due to strong demand for our Brazos and Llano-based APU platforms,

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

55.    On April 19, 2012, AMD issued a press release announcing its financial results for the first quarter ended March 31, 2012. AMD reported revenue of $1.59 billion, down 6% from the previous quarter but in line with guidance, and a net loss of $590 million, or $0.80 per share. With respect to outlook, the press release noted that AMD expected second quarter revenue to increase 3% sequentially, plus or minus 3%. The press release stated that "a complete top-to-bottom introduction of new APU offerings, combined with ample product supply resulting from continued progress with our manufacturing partners, positions us to win and grow."

56.    AMD held an earnings call following the first quarter 2012 earnings announcement. In the call, defendant Seifert noted "higher than anticipated demand for certain 32-nanometer Llano products, particularly in emerging markets." He further stated that "without any doubt, we have made good progress on the yield side on 32-nanometer." Defendant Read explained that, while supply constraints had occurred in late 2011, he did not see "any significant issues" in the important desktop market, and defendant Seifert noted that 32nm shipments, including the Llano APU, were "up significantly" during the 2012 first quarter.

57.    On May 9, 2012, AMD filed its Form 10-Q for the first quarter ended March 31, 2012. The Form 10-Q failed to furnish information about the effects that the prior Llano APU supply disruptions were then having on the Company's current operating results.

58.    Those problems began to emerge when AMD issued a press release on July 9, 2012, regarding its preliminary second quarter financial results for the period ended June 30, 2012. Therein, AMD stated it expected second quarter revenue to decrease approximately 11% from forecasts from April 19, 2012. The press release stated that AMD's expected lower preliminary revenue was primarily due to softer than expected channel sales in China and Europe, as well as a weaker consumer buying environment impacting the Company's OEM business.

59.    On July 19, 2012, AMD issued a press release announcing its second quarter financial results. For the quarter, the Company reported revenue of $1.41 billion, down 11% from the previous quarter, in line with AMD's July 9, 2012 press release, and net income of $37 million, or $0.05 per share. With respect to its then current outlook, the press release noted that AMD expected revenue during the third quarter of 2012 to decrease 1%, plus or minus 3%.

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

60.      AMD held an earnings call following the second quarter 2012 earnings announcement. Therein, defendants Read and Seifert finally explained that the primary reason for AMD's revenue shortfall was weak sales of Llano APUs for desktop products in the distribution channel, principally in the Chinese and European markets.

61.      Defendant Read noted that while sales to OEMs had increased sequentially based on their adoption of APUs, "desktop channel revenue declined significantly as our Llano product did not experience the same uptake it had with our OEM customers." Read blamed prioritization of Llano sales to OEMs during the period supply had been constrained in 2011. According to Read, "channel partners saw a dramatic change in supply linearity and a misalignment with motherboard availability. This clearly impacted Llano sales and built inventory in the channel."

62.      Despite admitting to the Llano channel problems, AMD failed to level with shareholders. At this point in time, given that AMD was having trouble selling the Llano APU to non-OEMs and that it was sitting on a Llano APU inventory glut, these units would likely need to be discounted in order to be sold before the next level APU, Trinity, came to market. Yet the truth about the impact on gross margins and future operating and financial results was not disclosed.

63.      On August 2, 2012, AMD filed its Form 10-Q for the second quarter ended June 30, 2012, signed by defendants Read and Seifert. This Form 10-Q improperly failed to disclose that AMD had accumulated a large excess of known, but undisclosed, overvalued Llano APU inventory that was reasonably likely to be written down in value, thereby adversely impacting the Company's gross margins.

64.      After the market closed on October 18, 2012, AMD issued a press release announcing its third quarter financial results. For the quarter, the Company reported revenue of $1.27 billion, down 10% from the previous quarter and a net loss of $157 million, or $0.21 per share. The Company also announced that its gross margins for the third quarter declined more than 31% from its previous quarter. AMD also recorded an approximate $100 million inventory write-down, mainly attributable to the overstated value of its Llano APU inventory.

65.      Following the Company's 2012 third quarter earnings announcement, AMD held a conference call with analysts and investors to discuss the Company's earnings and operations.

During the conference call, Devinder Kuniar, AMD's then interim CFO, explained that the Llano APU inventory write-down accounted for approximately 57% of the total quarter-over-quarter decline in AMD's gross margins. In reaction to this news, on October 19, 2012, AMD's stock price fell nearly 17%, erasing more than $310 million in market capitalization.

## THE SECURITIES CLASS ACTION

66.     On January 15, 2014, purchasers of AMD stock sued AMD and certain of its officers in this Court, asserting claims for violations of the federal securities laws based on the foregoing facts and disclosures regarding the Llano. An amended complaint was filed on June 11, 2014 by two institutional shareholders appointed as lead plaintiffs.

67.     In an order dated March 31, 2015 denying the motion to dismiss, U.S. District Judge Yvonne Gonzalez Rogers described the securities fraud claims as follows:

> Plaintiffs allege that defendants concealed the facts that (i) yield problems still existed and had persisted since 2010, and (ii) AMD was significantly supply-constrained. (CCAC ¶ 10.) Due to the supply issues, AMD only shipped Llanos to top-tier OEM customers; channel customers received no Llanos. (*Id.*) Plaintiffs allege that despite the critical decision not to supply channel customers with Llanos, defendants continually represented that the Llano devices were faring well in the market. Furthermore, the CCAC alleges that former employees from AMD and GF confirmed that the Llano yield was "horrible" during the class period and that defendants were fully informed of the yield issues. (CCAC ¶¶ 11–12.)
>
> Plaintiffs allege that in a series of disclosures, starting in September 2011, AMD began to inform the market of the Llano yield problem and its effects. On September 28, 2011, defendants admitted that AMD would miss its revenue guidance by four to six percent due to "less than expected supply." (CCAC ¶ 13.) Defendants nonetheless touted "strong" customer demand despite the fact that supply could not meet the demand due to the compromising yield problem. (*Id.*) Defendants continued to downplay the existence and effects of the yield problem during a subsequent earnings call with analysts in October of 2011, although they admitted that there had been some issues with yield that had impacted revenues to that point, maintained that AMD was working with its foundry partner, GF, to solve the yield problems, and continued to state that they were expecting increasing shipments of the Llano. (CCAC ¶¶ 14; 207-216.) Defendants made similar statements in the months the followed.
>
> Plaintiffs allege that such statements were materially untrue, because AMD did not begin shipping Llanos to third party channel distributors until December of 2011, and by then, demand had dwindled. (CCAC ¶¶ 15–16.) By that point, Llano had missed the back-to-school tech boom and the market had started to shift focus away from

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

designing products compatible with Llano. (*Id.*) Other vendors moved on to prepare for other, newer emerging technologies, such as AMD's "Trinity" APU, and thus had stopped creating component parts that would be compatible with Llano. (*Id.*) The result was an inventory glut of Llanos, AMD's highest inventory in years. Nonetheless, AMD continued to represent that channel sales were strong.

Defendants allegedly made additional public disclosures starting in mid-2012. In July 2012, AMD announced it would miss second quarter revenue guidance by 14% due to softer than anticipated channel sales in China and Europe, and the impact of weaker than expected consumer buying in AMD's OEM business. (CCAC ¶ 18.) Ten days later, on an earnings call, defendants admitted that the "soft" channel sales were due to Llano supply chain problems, which was "largely in AMD's control." (CCAC ¶ 19.) AMD nonetheless maintained that the Llano was a good product, and that it would sell well in the coming quarters. (CCAC ¶ 20.) Plaintiffs claim that such statements were knowingly misleading, because in the context of a one-year lifecycle (which is allegedly the case for microprocessors like Llano), by missing substantially its slated launch date, the damage to Llano sales had been done. (CCAC ¶ 21.)

Finally, in October 2012, AMD revealed that it was writing down $100 million of Llano inventory because it was not salable. (CCAC ¶ 22.) This would account for 8% of a 15% quarter over quarter decline in gross margin. (*Id.*) The stock price fell accordingly. In total, AMD's stock price dropped $6.17 (nearly 74%) during the class period. (CCAC ¶ 24.) Plaintiffs attribute this decline to defendants' allegedly false and misleading statements. (*Id.*)

68.    Based on these facts, Judge Gonzalez Rogers upheld claims for securities fraud against the Company and its senior executives under the exacting pleading standards of the PSLRA. First, the Court held that plaintiffs adequately alleged falsity of certain of the defendants' statements to shareholders and the market during 2001 and 2012, based on information provided to the plaintiffs by certain confidential witnesses, who described the continuing yield situation at GF as "horrible," and defendants' subsequent admissions about the continued improvements that were ultimately necessary to actually fix the yield problems at GF.

69.    Second, the Court held that allegations of scienter, or intent to defraud, were sufficient, based on information provided to the plaintiffs by confidential witnesses, to the effect that defendants Reid and Seifert were deeply involved in the yield issues at GF, followed the problems on a weekly basis, and knew that they were much worse than had been disclosed. According to the Court, "given the highly critical role that yield issues had played in the failure of the initial launch, the statement that such issues were 'behind' AMD when they allegedly were not

likewise supports the inference that these defendants exhibited an extreme departure from the standards of ordinary care intended to fairly inform reasonable investors."

## DAMAGES

70.    As a result of the Individual Defendants' improprieties, AMD disseminated improper public statements concerning the sales and financial results of Llano APUs and related products. These improper statements have damaged AMD's credibility as reflected by the Company's market capitalization loss of more than $4.2 billion, or 73%.

71.    AMD's performance issues also damaged its reputation within the business community and in the capital markets. In addition to price, AMD's current and potential customers consider a company's ability to manage its supply chain, introduce new products to the market in a prudent manner, and accurately understand the value of its inventory. Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions or that cannot accurately understand the impact that their own decisions about their products will have.

72.    AMD's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

73.    Further, as a direct and proximate result of the Individual Defendants' actions, AMD has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to costs incurred from defending and paying any settlement or judgment in the class action for violations of federal securities laws; and costs incurred from compensation and benefits paid to the defendants who have breached their duties to AMD.

## DERIVATIVE ACTION ALLEGATIONS

74.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23.1 on behalf of AMD to enforce the Company's claims against the Individual Defendants, which claims may properly be asserted by AMD and which AMD has failed to enforce.

75.     The wrongs complained of herein occurred during the Relevant Period, during which time Plaintiffs were shareholders of AMD.  Plaintiffs continue to hold shares of AMD.  Thus, Plaintiffs have standing to bring this derivative action on behalf of the Company to recover damages for all of the conduct described herein.

76.     Plaintiffs will fairly and adequately protect the interests of AMD and its shareholders in enforcing the rights of AMD against the Individual Defendants.  Plaintiffs' attorneys are experienced in this area of litigation and will prosecute this action diligently on behalf of AMD.  Plaintiffs have no interests adverse to AMD.

## DEMAND IS EXCUSED FOR FUTILITY

77.     Plaintiffs incorporate paragraphs 1-76.

78.     Demand on the Board of Directors to bring this action has not been made and is not necessary because such demand would be futile.  At the time of the filing of this complaint, AMD's Board of Directors consisted of twelve members, seven of whom are named as defendants in this action.  Each of these seven Director Defendants, due to their participation in the wrongful acts alleged and their potential individual financial exposure, are not disinterested and cannot exercise independent business judgment on the issue of whether AMD should prosecute this action.  None of these seven Director Defendants did anything to prevent the wrongful conduct of Officer Defendants, as alleged herein.  These directors knew of the unlawful acts, participated in the actions of their colleagues, and failed to prevent these breaches of loyalty.  These Director Defendants would never sue themselves or their colleagues to recover damages.  As a result, demand on AMD and its Board of Directors is futile and therefore excused.

79.     Demand is also excused because each of the Director Defendants knew and understood that the Llano microprocessor was critically important to AMD's gross margin and competitive future. According to the Company, the Llano was expected to be "highly gross margin accretive," and competitive with Intel's 32nm processor Sandy Bridge. Moreover, the Llano was expected to "be a big lever for [AMD] to improve pricing mix and price performance for the Company going forward" and was repeatedly touted as a revolutionary "game-changer." Information regarding the Llano was core information of the Company and was therefore

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

monitored, collected and reviewed regularly by the Board of Directors and the Officer Defendants, including defendant Su. As a result, the Director Defendants are implicated in the false and misleading statements and would never sue themselves or their colleagues to recover damages. Demand on AMD's Board of Directors is therefore futile and excused.

80.     Demand is also excused because defendant Su is named as a defendant in the Class Complaint and faces substantial likelihood of liability based upon her actions as an officer of the Company during the Relevant Period.  Consequently, defendant Su is neither independent of, nor disinterested in, the outcome of this shareholder derivative litigation and demand on defendant Su is futile and therefore excused.

81.     Demand is also excused because defendants Barnes, Caldwell, Chow and Harding served as members of AMD's Audit and Finance Committee during the Relevant Period and were specifically charged with oversight of AMD's press releases regarding its financial condition. The Audit and Finance Committee's Charter in effect during the Relevant Period provides that the committee is responsible for: (i) compliance with legal and regulatory requirements; (ii) the integrity of the Company's financial statements; (iii) performance of the Company's internal audit; and (iv) the hiring and performance of the Company's independent auditor. Additionally, the Audit and Finance Committee is charged with discussing with management the Company's earnings press releases and financial information provided to analysts and rating agencies. Defendants Barnes, Caldwell, Chow and Harding breached their fiduciary duties of loyalty and good faith because they knowingly or recklessly caused the dissemination of misleading statements to the public. Consequently defendants Barnes, Caldwell, Chow and Harding face a substantial likelihood of liability for their breaches of fiduciary duty, and demand upon each of these defendants is futile and therefore excused.

82.     Demand is also excused because defendants Claflin, Barnes, Caldwell, Chow, Donofrio and Harding served as members of AMD's Nominating and Corporate Governance Committee during the Relevant Period and were specifically charged with oversight of the Board and management, as well as the development and recommendation to the Board of corporate governance guidelines and internal control principles. Defendants Claflin, Barnes, Caldwell,

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

Chow, Donofrio and Harding's services on AMD's Nominating and Corporate Governance Committee were a sham in that they took no action whatsoever to ensure that an adequate system of internal controls was in place, as demonstrated by the Company's failure to make accurate and truthful public statements regarding the Llano supply, demand and financial projections. As such, demand on these defendants is futile and therefore excused.

83.    Among the additional facts demonstrating the futility of demand are the following:

(a)    In order to bring this action for breaches of fiduciary duty, the members of AMD's Board of Directors would have to sue themselves, and/or their fellow directors and allies in the top ranks of the Company. Annually, directors are granted restricted common stock and options to purchase common stock valued in excess of $170,000 per director. Given their financial interests in their positions, these defendants would never pursue the Company's claims.

(b)    AMD is and was controlled by its Board of Directors and, as described herein, the Director Defendants were involved in the wrongs alleged. The Director Defendants were ultimately responsible for the Company's disclosures, and were all involved in the wrongs alleged. In breach of their fiduciary duties of candor, these defendants issued false and misleading statements to shareholders, and face a substantial likelihood of liability. These wrongs have given rise to the Class Complaint, in which AMD common stock investors have sued the Company asserting claims under the federal securities laws. None of the Director Defendants are in a position to exercise independent business judgment with respect to the claims alleged herein due to his or her participation in, and responsibility for, the conduct giving rise to the securities class action litigation, which has damaged and will continue to damage AMD.

(c)    The acts complained of herein constitute violations of fiduciary duties owed to AMD and its shareholders as well as violations of law and, therefore, are

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    22

incapable of ratification.  Because the Director Defendants' actions were illegal and non-ratifiable, demand is excused as a matter of law.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY AGAINST ALL INDIVIDUAL DEFENDANTS

84.     Plaintiffs incorporate paragraphs 1-83.

85.     Each of the Individual Defendants was a director and/or officer of AMD during the Relevant Period, and as such owed to AMD fiduciary obligations.  In violation of their fiduciary duties of good faith, candor, and loyalty, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, material information and/or made material misstatements to AMD's shareholders regarding the Company's business and projected financial results, and the supply of and demand for the Llano.  These Individual Defendants knew, or recklessly disregarded, that the statements about AMD's Llano production and market demand, and AMD's financial condition were false and misleading when made.  The preparation and dissemination of inaccurate press releases, securities filings and statements provided to analysts and rating agencies alleged herein represents a failure by the Individual Defendants to ensure the existence within AMD of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to ensure the accuracy of the Company's financial reporting.

86.     By reason of this conduct, the Individual Defendants have exposed AMD to potential liability and to the cost of defending the securities litigation.  In addition, the Company's reputation and goodwill in the securities markets have been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

87.     Consequently, as a direct and proximate result, AMD has been and is being further damaged by the Individual Defendants' conduct in breach of their fiduciary duties.

## SECOND CAUSE OF ACTION

## CORPORATE WASTE AGAINST ALL INDIVIDUAL DEFENDANTS

88.     Plaintiffs incorporate paragraphs 1-87.

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

89.     By failing to properly consider the interests of the Company, by failing to conduct proper supervision, and by exposing AMD to substantial liability for allegedly violating the federal securities laws, the Individual Defendants have wasted AMD's assets.

90.     Consequently, as a direct and proximate result, AMD has been and is being further damaged by the Individual Defendants' conduct in committing corporate waste.

### THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT AGAINST ALL INDIVIDUAL DEFENDANTS

91.     Plaintiffs incorporate paragraphs 1-90.

92.     As a result of the Individual Defendants' conduct described above, the Individual Defendants will be and have been unjustly enriched at the expense of the Company, in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office.

93.     Consequently, AMD has been damaged by the Individual Defendants' conduct.

94.     Plaintiffs, as shareholders of AMD, seek restitution from the Individual Defendants and an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and breaches of fiduciary duties. Plaintiffs, on behalf of AMD, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of AMD, demand judgment against the Individual Defendants as follows:

A.     Determining that this suit is a proper derivative action and certifying Plaintiffs as appropriate representatives of AMD for said action.

B.     Declaring that each of the Individual Defendants breached his or her fiduciary duties to AMD.

C.     Determining and awarding AMD the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon.

D.     Determining and awarding AMD restitution from the Individual Defendants, and each of them, including ordering disgorgement of all profits, benefits, and other compensation obtained by said Individual Defendants.

E.     Granting extraordinary equitable relief and/or injunctive relief as permitted by law, equity, and state statutory provisions sued on hereunder, including attaching, impounding, imposing a constructive trust upon, or otherwise restricting the proceeds of the Individual Defendants' trading activities or their assets so as to ensure that Plaintiffs have an adequate remedy.

F.     Directing AMD to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect AMD and its shareholders from repeating the damaging events described herein.

G.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses.

H.     Granting such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.


Dated:  April 27, 2015                        SCHUBERT JONCKHEER & KOLBE LLP


                                                    s/ Willem F. Jonckheer
                                             ROBERT C. SCHUBERT S.B.N. 62684
                                             WILLEM F. JONCKHEER S.B.N. 153748
                                             MIRANDA P. KOLBE S.B.N. 214392

                                             Three Embarcadero Center, Suite 1650
                                             San Francisco, California  94111
                                             Telephone:      (415) 788-4220
                                             Facsimile:      (415) 788-0161

SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
(415) 788-4220

## <u>VERIFICATION</u>

I, Christopher Hamilton, am a plaintiff in the captioned matter. I have read the foregoing VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and know its contents. I am informed and believe, and on that ground allege, that the matters stated therein are true and correct.

Executed this 27th day of April, 2015, in Decatur, Georgia. I declare under penalty of perjury that the foregoing is true and correct.

_____
Christopher Hamilton

## <u>VERIFICATION</u>

I, David Hamilton, am a plaintiff in the captioned matter. I have read the

foregoing VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT and know its

contents. I am informed and believe, and on that ground allege, that the matters stated

therein are true and correct.

Executed this 27th day of April 2015, in Stewartsville, New Jersey. I declare

under penalty of perjury that the foregoing is true and correct.


_____
David Hamilton