**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **DAVID HAMILTON,** | Case No.: 15-CV-1890 YGR |
| Plaintiff, | **ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND** |
| vs. | **DKT. NO. 61** |
| **W. MICHAEL BARNES, ET AL.,** | |
| Defendants. | |
| **JAKE HA,** | Case No. 15-CV-4485 YGR |
| Plaintiffs, | **DKT. NO. 32** |
| vs. | |
| **JOHN E. CALDWELL, ET AL.,** | |
| Defendants | |

Plaintiffs David Hamilton and Jake Ha bring these related shareholder derivative actions on behalf of nominal defendant Advanced Micro Devices, Inc., a Delaware corporation ("AMD" or the "Company"), against certain of its officers and directors. Hamilton brings claims for violations of state law, including breach of fiduciary duties, unjust enrichment, and waste of corporate assets. Ha alleges claims for breach of fiduciary duties, violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and U.S. Securities and Exchange Commission ("SEC") Regulations (17 C.F.R. § 240.14a-9(a)), abuse of control, and gross mismanagement. Defendants have filed motions to dismiss the amended complaints in both actions for failure to allege demand futility adequately. Defendants also contend that plaintiff Ha's Section 14(a) claims are time-barred.

Having carefully considered the papers submitted, the matters judicially noticeable, and the pleadings in this action, and for the reasons set forth below, the Motions to Dismiss are **GRANTED WITH LEAVE TO AMEND** as stated herein.

## I. BACKGROUND

### A. SUMMARY OF ALLEGATIONS

AMD is a major semiconductor company that designs, develops, and sells microprocessors and accelerated processing units (APUs) for inclusion in desktop personal computers, notebooks, tablets, hybrids, servers, and embedded products. The Company sells its central processing units (CPUs) and APUs directly to Original Equipment Manufacturers ("OEMs"), and also to third-party distributor "channel" partners. Channel partners resell AMD products to other customers. (*Hamilton* Amended Complaint, Dkt. No. 51-4 ["*Hamilton* AC"] ¶ 2.)

Between April 4, 2011 and October 18, 2012, AMD is alleged to have issued false and misleading statements concerning the AMD's first generation APU, marketed as the "Llano." (*Id.* ¶ 3.) The Llano contains a series of 64-bit microprocessors designed to act as a CPU and graphics accelerator (GPU) on a single silicon chip. (*Id.*) AMD touted the Llano as the "next generation of computing," declaring it "an inflection points for AMD and . . . perhaps the industry's biggest architectural change since the invention of the microprocessor." (*Id.*)

During the period from April 4, 2011 and October 18, 2012, AMD represented to the public that there was "strong" and "significant" interest in and demand for the Llano, and that demand was "higher than anticipated." (*Id.* ¶ 4.) AMD concealed from investors that demand for the Llano actually was much weaker than expected, and that problems existed with the production process and product yield. (*Id.* ¶ 5.) AMD prioritized providing Llanos to OEMs, such that it did not have sufficient supplies for its channel partners. (*Id.*)

In March 2, 2009, AMD formed GlobalFoundries, Inc. ("GF"), a manufacturing joint venture for the manufacture of semiconductor products and foundry services. (*Id.* ¶ 39.) AMD then entered into a Wafer Supply Agreement ("WSA") with GF, which governed the terms by which AMD purchased chips manufactured by GF. (*Id.*) Pursuant to the WSA, AMD was required to purchase all of its microprocessor unit and APU product requirements from GF, with certain limited exceptions. AMD's ownership interest in GF was divested in March 2012, but AMD thereafter remained highly dependent on GF for the components it needed to create its APUs.

The Llano was originally set for release in 2010, but problems arose with the yield of usable chips produced by GF. (*Id.* ¶ 42.) AMD reset the launch date for the second quarter of 2011. (*Id.*) During the intervening months, AMD misrepresented to the public that production problems were resolved, and that there was strong and significant interest in and demand for Llano APUs. (*Id.* ¶ 3.) In April 2011, AMD executives represented that the Llano yield issues were "behind" AMD and there would be "ample . . . product" of the Llano for sale and that AMD "very strong channel business." (*Id.* ¶¶ 45, 48.)

On June 14, 2011, AMD launched the Llano with much fanfare. (*Id.* ¶ 50.) On July 21, 2011, AMD issued a press release reporting revenue of $1.57 billion, and net income of $61 million, or $0.08 per share for the second quarter of 2011. (*Id.* ¶ 52.) At that time, AMD executives stated that "as the Llano APU penetration continues, we expect to increasingly participate in mainstream and performance notebook market segments," and Llano sales were strong. (*Id.*) AMD executives again expressed that AMD was "satisfied with the yield and the support [it] was getting from [GF]" and the Llano yield issues were in the past. (*Id.* ¶ 52.)

On August 25, 2011, Defendant Read was named AMD's President, CEO, and a member of the board. Defendant Read was quickly brought up to speed concerning AMD's continuing serious struggles relating to the Llano. (*Hamilton* AC ¶ 55.)

On September 28, 2011, the Individual Defendants were forced to admit, partially, that the Company was still struggling with Llano supply issues. Specifically, AMD announced that the Company would miss revenue guidance for the third quarter of 2011 by between 4-6% and that margins were now expected to be only 44% to 45%, instead of the previously forecasted 47%. The Company primarily blamed the shortfalls on a "less-than-than expected supply of 'Llano'" due to "yield, ramp and manufacturing issues at [GF]." (*Id.* ¶ 57.) However, AMD continued to tout publicly the success of its Llano APUs and, on October 27, 2011, to report revenue increases, and predict an increase of 3% sequentially for revenue for the 2011 fourth quarter based on the strong adoption of its APUs. (*Id.* ¶ 61.) AMD executives continued to dismiss concerns about Llano yield problems. (*Id.* ¶ 62.)

In its November 9, 2011 Form 10-Q, AMD acknowledged that GF experienced yield and manufacturing difficulties "which adversely impacted our ability to fulfill customer demand." (*Id.* ¶ 63.) On February 2, 2012, defendant Su stated that AMD's APUs had "great customer reception" and growing momentum, but omitted that demand for the Llano had actually decreased due to supply constraints. (*Id.* ¶ 69.) Later that month, on February 24, 2012, director defendants Barnes, Caldwell, Chow, Claflin, and Donofrio signed off on a Form 10-K for the fourth quarter of 2011 which stated that AMD had "experienced strong customer demand, especially for . . . our AMD A-Series APUs, codenamed "Llano." (*Id.* ¶ 71.) AMD's February 24, 2012 Annual Report highlighted the importance of the Llano to the company. (*Ha* Amended Complaint, Dkt. 25, ["*Ha* AC"] ¶ 69.)

By the time the production issues were remedied in mid-2012, demand for the Llano was faltering and AMD had already announced plans to launch a second generation APU, leaving AMD with an inventory of Llanos that it could not sell. (*Hamilton* AC ¶ 6.) AMD boasted that it had "ample" supply to meet "very strong" demand, and that the Llano was a "huge success," while privately bemoaning that AMD was "struggling" to sell the Llano in the channel market and had an "excess supply." (*Id.* ¶ 8.) Hamilton alleges that documents in defendants' possession confirm that the individual defendants had knowledge of the problems with the Llano every step of the way but repeatedly offered the public positive projections. (*Id.* ¶ 7.)

On May 9, 2012, AMD filed its Form 10-Q for the first quarter ended March 31, 2012. The Form 10-Q failed to furnish information about the effects that the prior Llano APU supply disruptions were then having on the Company's current operating results. (*Id.* ¶ 79.) Persistent and ongoing Llano issues only began to emerge publically when AMD issued a press release on July 9, 2012 regarding its preliminary second quarter financial results for the period ended June 30, 2012, revealing that revenue was less than expected due to low channel sales. (*Id.* ¶ 84.) Likewise, in a July 19, 2012 earnings call, defendant Su stated that:

> [w]e got ourselves a bit out of position admittedly and that's a big reason for our shortfall. But when we look forward, it's really the focus on sellout velocity and getting the overall positioning correct with both the CPUs as well as the motherboards. And we think we're doing that.

(*Ha* AC ¶ 118.)  This statement was contrary to the truth: that Llano was not close to reaching "sellout velocity" but instead had an inventory increase to $833 million, up from $248 million in the prior quarter. (*Id*. ¶119.)  AMD did not reveal that it had a glut of Llano stock that would become unsalable with AMD's release of its next generation of APUs.  (*Hamilton* AC ¶¶ 88, 89.)

Finally, on October 18, 2012, AMD issued a press release regarding its third quarter results for 2012 reporting a net loss of $157 million in revenue, and a $100 million inventory write-down mainly attributable to its overstated value of the Llano APU inventory.  (*Id.* ¶ 90.)  Thus, AMD's stock price dropped $6.17, or nearly 74%, from a high of $8.35 on March 27, 2012, to a low of $2.18 a share by October 18, 2012.  (*Id.* ¶¶ 9, 93.)

On January 15, 2014, purchasers of AMD stock sued AMD and certain of its officers in this Court, asserting claims for violations of the federal securities laws based on the foregoing facts and disclosures regarding the Llano, in an action entitled *Hatamian v. Advanced Micro Devices, Inc., et al.*, 4:14-cv-226-YGR.  (*Id.* ¶ 92.)[1]  In its March 31, 2015 Order denying the motion to dismiss the amended complaint in that action, the Court found that plaintiffs therein had alleged falsity sufficiently, stating as follows:

> Plaintiffs allege that defendants concealed the facts that (i) yield problems still existed and had persisted since 2010, and (ii) AMD was significantly supply-constrained. (CCAC ¶ 10.) Due to the supply issues, AMD only shipped Llanos to top-tier OEM customers; channel customers received no Llanos. (*Id.*) Plaintiffs allege that despite the critical decision not to supply channel customers with Llanos, defendants continually represented that the Llano devices were faring well in the market. Furthermore, the CCAC alleges that former employees from AMD and GF confirmed that the Llano yield was "horrible" during the class period and that defendants were fully informed of the yield issues. (CCAC ¶¶ 11–12.)
>
> Plaintiffs allege that in a series of disclosures, starting in September 2011, AMD began to inform the market of the Llano yield problem and its effects. On September 28, 2011, defendants admitted that AMD would miss its revenue guidance by four to six percent due to "less than expected supply." (CCAC ¶ 13.) Defendants nonetheless touted "strong" customer demand despite the fact that

---

[1] Defendants in the *Hatamian* action were: Advanced Micro Devices, Inc., Richard A. Bergman, Rory P. Read, Thomas J. Seifert, and Lisa T. Su.  Of these defendants, only Su served as a director during the relevant time period here.

supply could not meet the demand due to the compromising yield problem. (*Id.*) Defendants continued to downplay the existence and effects of the yield problem during a subsequent earnings call with analysts in October of 2011, although they admitted that there had been some issues with yield that had impacted revenues to that point, maintained that AMD was working with its foundry partner, GF, to solve the yield problems, and continued to state that they were expecting increasing shipments of the Llano. (CCAC ¶¶ 14; 207- 216.) Defendants made similar statements in the months the followed.

Plaintiffs allege that such statements were materially untrue, because AMD did not begin shipping Llanos to third party channel distributors until December of 2011, and by then, demand had dwindled. (CCAC ¶¶ 15–16.) By that point, Llano had missed the back-to-school tech boom and the market had started to shift focus away from designing products compatible with Llano. (*Id.*) Other vendors moved on to prepare for other, newer emerging technologies, such as AMD's "Trinity" APU, and thus had stopped creating component parts that would be compatible with Llano. (*Id.*) The result was an inventory glut of Llanos, AMD's highest inventory in years. Nonetheless, AMD continued to represent that channel sales were strong.

Defendants allegedly made additional public disclosures starting in mid-2012. In July 2012, AMD announced it would miss second quarter revenue guidance by 14% due to softer than anticipated channel sales in China and Europe, and the impact of weaker than expected consumer buying in AMD's OEM business. (CCAC ¶ 18.) Ten days later, on an earnings call, defendants admitted that the "soft" channel sales were due to Llano supply chain problems, which was "largely in AMD's control." (CCAC ¶ 19.) AMD nonetheless maintained that the Llano was a good product, and that it would sell well in the coming quarters. (CCAC ¶ 20.) Plaintiffs claim that such statements were knowingly misleading, because in the context of a one-year lifecycle (which is allegedly the case for microprocessors like Llano), by missing substantially its slated launch date, the damage to Llano sales had been done. (CCAC ¶ 21.)

Finally, in October 2012, AMD revealed that it was writing down $100 million of Llano inventory because it was not salable. (CCAC ¶ 22.) This would account for 8% of a 15% quarter over quarter decline in gross margin. (*Id.*) The stock price fell accordingly. In total, AMD's stock price dropped $6.17 (nearly 74%) during the class period. (CCAC ¶ 24.) Plaintiffs attribute this decline to defendants' allegedly false and misleading statements.

(*Id.*)

On March 16, 2016, the Court certified a class in the Securities Class Action, consisting of all purchasers of AMD stock during the period from April 4, 2011 through October 18, 2012. (*Id.*

¶ 96.) On March 2, 2018, the Court issued an order finally approving the class action settlement for $29.5 million, and it entered judgment thereafter on March 6, 2018.

### B.    PROCEDURAL HISTORY OF THE INSTANT ACTION

Plaintiff Hamilton filed his original complaint on April 27, 2015.  On June 4, 2015, the Court entered an Order Granting Corrected Stipulation to Temporarily Stay Civil Action.  (Dkt. No. 32 ["*Hamilton* Stay Order"].)  On December 21, 2017, defendants moved to dismiss the original complaint.  Hamilton moved to strike the motion to dismiss as having been filed in contravention of the *Hamilton* Stay Order (Dkt. No. 43).  The Court denied the motion to strike and permitted the motion to dismiss to go forward.  (Dkt. No. 46.)  Thereafter, Hamilton filed an amended complaint on February 9, 2018.

Plaintiff Ha filed his original complaint on September 29, 2015.  The Court related this matter to the pending *Hamilton* matter by Order issued December 1, 2015.  (Dkt. No. 8.)  On December 22, 2015, the Court entered an Order Granting Stipulation to Stay Action. (Dkt. No. 11 ["*Ha* Stay Order"].)  As in the *Hamilton* action, on December 21, 2017, defendants moved to dismiss the original complaint. (Dkt. No. 20.)  Thereafter on February 2, 2018, Ha filed his amended complaint.

## II.    APPLICABLE STANDARD

A shareholder derivative suit is an action brought by a shareholder on behalf of a corporation.  *See Tindall v. First Solar Inc.*, 892 F.3d 1043, 1044–46 (9th Cir. 2018).  Before bringing the complaint, the shareholder must "demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *La. Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1057 (9th Cir. 2016), quoting *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014).  The law of the state of incorporation governs whether a demand would have been futile.  *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014).  Here, the parties agree that Delaware law applies.

Under Delaware law "pre-suit demand is excused [when] the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).  Delaware has two tests for demand futility—the *Aronson* test and

the *Rales* test. *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (*citing Aronson v. Lewis*, 473 A.2d 805 (1984) and *Rales v. Blasband,* 634 A.2d 927 (Del. 1993)).

The *Aronson* test permits a plaintiff to demonstrate futility by alleging particularized facts creating a reason to doubt either: (1) that the directors are disinterested and independent with respect to the challenged *transaction*; or (2) that "the challenged *transaction* was otherwise the product of a valid exercise of business judgment." *Wood*, 953 A.2d at 140, quoting *Aronson*, 473 A.2d at 814 (emphasis supplied); *see Rales* 634 A.2d at 933 (*Aronson* test looks to whether the directors are disinterested and independent with respect to financial benefits of a challenged transaction). The *Aronson* test for demand futility focuses on allegations raising a doubt as to the directors' independent judgment with respect to a particular business transaction or decision. "The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit." *Rales*, 634 A.2d at 933 (emphasis in original).

By contrast, under the *Rales* test, the court considers "whether or not the particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment *in responding to a demand*." *Id.* at 934 (emphasis supplied). The Court must determine whether a majority of the members of the board at the time of the pre-suit demand could be expected to "act free of personal financial interest and improper extraneous influences." *Id.* at 935.

Which test applies depends upon whether the plaintiff contends that the relevant directors could not have exercised their independent and disinterested business judgment with respect to a particular business transaction, or with respect to the litigation demand itself. *Wood*, 953 A.2d at 140 (*Aronson* test applies to "claims involving a contested transaction," while *Rales* test requires showing reason to doubt "independent and disinterested business judgment in responding to a demand"). "In order to determine whether the Board could have impartially considered a demand at the time [plaintiff's] complaint was filed, it is appropriate to examine the nature of the decision confronting it." *Rales,* 634 A.2d at 935.

> The task of a board of directors in responding to a stockholder demand letter is a two-step process. First, the directors must determine the best method to inform themselves of the facts relating to the alleged wrongdoing and the considerations,

8

> both legal and financial, bearing on a response to the demand. If a factual
> investigation is required, it must be conducted reasonably and in good faith.
> Second, the board must weigh the alternatives available to it, including the
> advisability of implementing internal corrective action and commencing legal
> proceedings. In carrying out these tasks, the board must be able to act free of
> personal financial interest and improper extraneous influences.

*Id.* at 935 (internal citations omitted). "A director is considered interested where [the director] will receive a personal financial benefit from a transaction that is not equally shared by the stockholders . . . [or] a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.* at 936, citing *Aronson,* 473 A.2d at 812. When such circumstances are alleged, "a director cannot be expected to exercise [] independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Id.*

Thus, when the board at the time of the pre-suit demand is not involved in a challenged business decision, the *Aronson* test does not apply and courts instead look to the *Rales* test. So, for instance, the *Rales* test would apply "(1) where a business decision was made by the board of a company, but a majority of the directors making the decision have been replaced; (2) where the subject of the derivative suit is not a business decision of the board; and (3) where . . . the decision being challenged was made by the board of a different corporation." *Id.* at 933-34. The *Aronson* test cannot logically apply in these circumstances because "the essential inquiry contemplated by *Aronson*—whether the directors have acted in conformity with the business judgment rule in approving the *challenged transaction*"—cannot be answered "[w]here there is no conscious decision by directors to act or refrain from acting." *Id.* at 933 (emphasis supplied). Where a complaint "charges the director defendants with breach of their duty of attention or care in connection with the on-going operation of the corporation's business" by failing to be "active monitors of corporate performance," because there is no business decision or transaction at issue, courts apply the *Rales* test. *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996); *see Tindall v. First Solar Inc.*, 892 F.3d 1043, 1046 (9th Cir. 2018). "[A]bsent grounds to suspect deception, neither corporate boards nor senior officers can be charged with wrongdoing simply for assuming the integrity of employees and the honesty of their dealings on the company's

behalf." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 969 (Del. Ch. 1996). In these situations, the *Rales* test is the appropriate test for demand futility.

A claim that the defendants "knew or should have known about illegal conduct and made a conscious choice to turn a blind eye can be characterized either as a *Caremark*-type oversight claim or as an *Aronson*[-]type allegation of considered board action." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1151 (9th Cir. 2014). "[E]ither way, demand is excused if [p]laintiffs' particularized allegations create a reasonable doubt as to whether a majority of the relevant [board] faces a substantial likelihood of liability for failing to act in the face of a known duty to act." *Rosenbloom*, 765 F.3d at 1151. "If the directors face a 'substantial likelihood' of personal liability, their ability to consider a demand impartially is compromised under *Rales,* excusing demand." *Id.* If the directors "fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities," such a failure to act would give rise to substantial liability for breach of the duty of loyalty, and therefore excuse demand as well. *Id.*

Thus, in *Rosenbloom*, the Ninth Circuit held that allegations that the board was on notice of serious misconduct and failed to investigate would be sufficient to allege that a demand on the board was futile. *Id.* at 1151, 1154 ("If a majority of the Board had actual or constructive knowledge of violations of the law . . . and did nothing, it violated its duty of loyalty and faces a substantial likelihood of liability.") In determining whether the allegations of the complaint sufficiently allege demand futility, the court must consider whether the particularized allegations, individually or in combination, support a plausible "inference of conscious inaction" or wrongdoing by a majority of the board members. *Rosenbloom*, 765 F.3d at 1155-56. Plaintiff must undertake a "director-by-director analysis" to show that a majority of the directors was incapable of objectively evaluating a demand. *Raul v. Rynd*, 929 F. Supp. 2d 333, 346 (D. Del. 2013).

Where the complaint alleges that the directors are "interested" because they face a substantial likelihood of liability for breach of fiduciary duties, the court must also consider whether, as here, the company's certificates of incorporation contain an exculpatory clause limiting their liability under Delaware law to those situations where plaintiff "allege[s] particularized facts showing that the directors engaged in 'disloyal,' 'fraudulent, illegal or bad faith conduct,' and

'acted with scienter,'" rather than merely negligent or reckless conduct. *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, No. 17-CV-00162-RS, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (citing *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) and *McPadden v. Sidhu*, 964 A.2d 1262, 1274-75 (Del. Ch. 2008)).

## III.  DISCUSSION

Plaintiffs' complaints each take a different approach with respect to the allegations against the Board.  The *Hamilton* complaint alleges that a majority of the AMD Board, as constituted on April 27, 2015, was aware of and participated in the alleged wrongful acts.  (*Hamilton* AC ¶¶ 24, 106.)  Hamilton contends that the wrongful acts alleged were the knowing or reckless dissemination of materially false and misleading statements to the public, and failure to prevent breaches of loyalty.  (*Id.* ¶¶ 24, 110.)  Hamilton contends that defendant board members Barnes, Caldwell, Chu, Claflin, Donofrio, Harding, and Su were all aware of and failed to correct materially false and misleading statements regarding the Llano made by AMD officers, and also authorized and benefitted from those statements. (*Id.* ¶¶ 24, 106.)  Thus, the *Hamilton* complaint alleges that the relevant board members had "potential individual financial exposure" and were not capable of making a disinterested, independent decision with respect to a pre-suit demand.  (*Id.* ¶ 106.)

The *Ha* amended complaint alleges that demand would have been futile because, as of September 29, 2015, a board majority: (1) was conflicted through employment by AMD, status as "non-independent" directors, or their interlocking interests due to board service, financial payments, business conducted with AMD, and service to AMD subsidiary companies such as Advanced Research; and (2) had "demonstrated an inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors for the violations of law" stated therein, *i.e.* informing shareholders about the materially false and misleading statements.  (*Ha* AC ¶¶ 4, 147 (a)(b).)  The *Ha* AC alleges that a majority of the eleven members of the relevant board were incapable of independently considering a demand: four defendants were non-independent directors (Su, Yahia, Edelman, and Harding) and six defendants were on the Audit and Governance committees (Caldwell, Chow, Householder, Inglis, Denzel and Donofrio).

### A. Relevant Demand Board

Defendants move to dismiss both amended complaints on the grounds that plaintiffs have failed to allege demand futility as to the relevant board of directors which, from defendants' perspective, is the board in place at the time of the filing of plaintiffs' *amended* complaints in February 2018. By contrast, each of the amended complaints alleges futility with respect to the board as comprised at the time of the filing of plaintiffs' *original* complaints.

As a general rule, for purposes of determining demand futility, "[t]he relevant board is the board as it was constituted when the shareholders filed their amended complaint." *Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1058 (9th Cir. 2016) (quoting *Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006)). This rule is an outgrowth of the basic principle that unless a derivative claim is "validly in litigation," a board of directors has a "right and duty to control corporate litigation . . . to ensure that through derivative suits shareholders do not improperly seize corporate powers." *Braddock*, 906 A.2d at 785 (quoting *Harris*, 582 A.2d at 230). Voluntarily amending the complaint will "trigger a new requirement to make demand if the earlier complaint could not have survived a motion to dismiss, even if it had not actually been dismissed." *In re Nyfix, Inc. Derivative Litig.*, 567 F. Supp. 2d 306, 311 (D. Conn. 2008).

Both amended complaints allege that the relevant board is the board composition at the time of the filing of the original action. They do so based upon nearly identical stipulations in each case which provide:

> The composition of AMD's Board of Directors that will be considered in connection with determining whether Plaintiffs have pled facts sufficient to raise a reasonable doubt that a pre-litigation demand on the Company's Board of Directors would have been futile shall be the composition of the Board of Directors as of . . . the date this action was initiated.

(*Hamilton* Dkt. No. 32 at ¶ 6; *Ha* Dkt. No. 11 at ¶ 5.) Thus, the *Hamilton* AC alleges:

> [a]s set forth in the Corrected Stipulation and Order to Temporarily Stay Civil Action, dated June 4, 2015 ([*Hamilton*] Dkt No. 32), the relevant board of AMD for assessing demand futility consists of the following twelve individuals who comprised AMD's board on April 27, 2015, the date this action was filed: Defendants Claflin, Barnes, Caldwell, Chow, Donofrio, Harding and Su, and non-defendants Nora M. Denzel, Martin Edelman, Joseph A. Householder, Michael J.

Inglis, and Ahmed Yahia (the "Demand Board"). A majority of directors on the Demand Board (seven of twelve directors) are defendants in this action. (*Hamilton* AC ¶ 105.) Ha does not specifically allege reliance on the stipulated stay order in the *Ha* action (*Ha* Dkt. No. 11), but nevertheless contends that the relevant board for purposes of demand is the board as it was composed on September 29, 2015. (*Ha* AC ¶ 4; Oppo. at 11.)

Defendants argue that the stipulations are merely retrospective, meaning that they "froze the status quo and prevented Defendants from arguing that subsequent changes to AMD's Board composition could negate the futility allegations in Plaintiffs' original complaints." (Reply at fn. 1.) They contend that plaintiffs offer "no citations to the record of negotiations between the parties" to support an interpretation that demand futility would be assessed against the boards at the time the action was initiated, regardless of any amendment to the complaints. By the same token, defendants offer no extrinsic evidence to support their interpretation of the stipulation either.[2]

On a motion to dismiss, defendants have the burden to show that plaintiffs' allegations are insufficient to state a basis for demand futility. Defendants argue that the benefit of the bargain in the stipulations was limited to providing plaintiffs a seat at the mediation table in the *Hatamian* action and enough shared discovery to make mediation meaningful. However, these arguments merely serve to highlight the conflict in the parties' interpretations of a stipulation that is, at best, ambiguous. Further, defendants offer no authority to support their suggestion that, in the absence of a stipulation, any "subsequent changes to AMD's Board composition could negate the futility allegations in Plaintiffs' original complaints." (Reply at fn. 1.) At the pleading stage, when all reasonable inferences must be drawn in favor of plaintiffs, the unqualified statement that the relevant board "shall be the composition of the Board of Directors as of . . . the date this action was initiated," is sufficient to state a plausible basis for considering demand futility in relation to the board at the time of the filing of the original complaints here. Accordingly, for purposes of a motion to dismiss, the Court will consider the board composition to be that of the filing of the original complaint.

_____

[2] To the extent there are factual issues to be resolved in order to determine the meaning of the stipulation with respect to the allegations here, it would not appear that a motion to dismiss is the proper procedural vehicle for so doing.

**B.      Use of *Hatamian* Discovery**

Next, defendants contend that the Court should disregard those paragraphs in the *Hamilton* AC which are based upon discovery in the related *Hatamian* securities action, which was provided to plaintiffs under the terms of their stipulation with defendants.  Hamilton counters that the stipulation placed no restriction on the use of the discovery other than compliance with the protective order in that case.  The *Hatamian* protective order provided, in pertinent part:

> A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party *in connection with this case only for prosecuting, defending, or attempting to settle this litigation*.  Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order.  When the litigation has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

(*Hatamian v. Advanced Micro Devices, Inc. et al.,* 14-cv-226 YGR, Dkt. No. 136 at ¶ 7.1 ["*Hatamian* Protective Order"], emphasis supplied.)  First, the reference to "this case" is to the *Hatamian* action.  Second, section 13 of the *Hatamian* Protective Order provided that a Receiving Party must return or destroy all Protected Material within 60 days of the disposition of the *Hatamian* action.  While the *Hamilton* AC was filed *prior* to the final disposition of the *Hatamian* litigation on March 6, 2018, the Court cannot find that Hamilton's amendment of his complaint using information obtained from documents covered under the terms of the *Hatamian* Protective Order was permitted by its terms.  Although the stipulation did not articulate limits on plaintiff, the *Hatamian* Protective Order did.  Plaintiff Hamilton cannot rely on the information learned through the discovery provided in *Hatamian* to augment his complaint.

Thus, the Court will not consider the allegations of the unredacted *Hamilton* AC set forth in the following paragraphs in determining whether plaintiffs have alleged demand futility sufficiently: 8 (partial), 43 (partial), 44, 46, 47, 48 (partial), 49 (partial), 51, 53, 55 (partial), 56, 58, 59, 60, 62 (partial), 70, 71 (partial), 74, 75, 78 (partial), 80, 81, 82, 83, and 107 (partial).[3]

//

---

[3] Stated otherwise, the allegations that the Court will consider in connection with the motion to dismiss are those allegations contained in the redacted public version of the *Hamilton* Amended Complaint, filed at *Hamilton* Docket No. 56.

## C. Sufficiency of Allegations of Futility

### 1. *Hamilton* Amended Complaint

Defendants argue that plaintiffs have not alleged fraud and scienter in more than a conclusory way, so they have failed to allege demand futility as well. Defendants argue that, even if the statements alleged in *Hatamian* were materially misleading, plaintiffs here have not alleged facts alleged showing that the directors knew or should have known the same. The Court agrees. Once the allegations impermissibly relying on the *Hatamian* discovery are discounted, the *Hamilton* AC does not offer particularized allegations to establish that a majority of the relevant board was aware that the SEC filings, press releases, and other public statements were materially misleading.

To establish demand futility based upon breach of loyalty, plaintiff must allege with particularity that the directors "fail[ed] to act in the face of a *known* duty to act, thereby demonstrating a *conscious* disregard for their responsibilities." *Rosenbloom*, 765 F.3d at 1150-51 (emphasis supplied). Plaintiff must offer facts to show that the board was on notice of serious misconduct and failed to investigate in order to establish a substantial likelihood of liability, and resulting demand futility. *Id.* at 1151, 1154 ("If a majority of the Board had actual or constructive knowledge of violations of the law . . . and did nothing, it violated its duty of loyalty and faces a substantial likelihood of liability.")

Here, the *Hamilton* AC alleges in a generalized, conclusory manner that the director defendants authorized and benefitted from misstatements in AMD's 10-K filings, press releases and public statements, and that they were "aware of and failed to correct materially false and misleading statements and omissions regarding the Llano made by Officer Defendants." (*Hamilton* AC ¶¶ 23-28.) The *Hamilton* AC merely alleges that board members authorized the February 24, 2012 Form 10-K, which stated there had been "strong customer demand" for the Llano. (*Id.* ¶¶ 71, 107.) Hamilton also alleges that director defendants Barnes, Caldwell, Chow, Claflin, and Donofrio signed the 10-K filing. (*Id.*) However, these do not constitute particularized allegations that these defendants knew the 10-K was materially misleading.

Second, Hamilton alleges that the board defendants "received numerous and regular updates concerning significant Llano production, supply, and demand problems [and t]he Llano issues were emphasized to the board throughout the Relevant Period in presentations, emails, and board meetings." However, Hamilton is unable to allege any particularized facts to support this conclusory allegation. He merely alleges that defendants Claflin, Barnes, Caldwell, Chow, Donofrio and Harding authorized, permitted, and "repeatedly acquiesced to the making of improper statements about: (i) AMD's failure to acknowledge the known yield problems and supply constraints at GF that affected production of the Llano APU throughout the entirety of 2011; (ii) the decrease in demand for the Llano APU that was likely the result of the delay caused by the supply constraints; (iii) the failure to acknowledge that the introduction of the Trinity APU would reduce demand for the Llano; and (iv) the failure to acknowledge that the introduction of the Trinity APU would require price cuts for the Llano APU, which would affect gross margins and the value of AMD inventory." (*Id.*¶ 108.) Without the aid of the information obtained in the *Hatamian* discovery, Hamilton is unable to allege that any of those defendants were aware of the falsity of any of the statements.

Third, the *Hamilton* AC alleges that certain defendants were members of committees charged with oversight concerning dissemination of truthful statements to the public, and that they failed in those duties. With respect to the Audit and Finance Committee, Hamilton alleges that defendants Barnes, Caldwell, Chow, and Harding, as members thereof, were charged with oversight of AMD's press releases regarding its financial condition, and breached their fiduciary duties of loyalty and good faith because they knowingly or recklessly caused the dissemination of misleading statements to the public. (*Id.* ¶ 110.) With respect to the Nominating and Corporate Governance Committee, Hamilton further alleges that defendants Barnes, Caldwell, Chow, Claflin, Donofrio, and Harding were members thereof charged with oversight of board and management, but took no action to ensure that a system of internal controls was in place, and failed to make accurate, truthful public statements. (*Id.* ¶ 111.)[4]

---

[4] To the extent that Hamilton alleged compensation paid to Board members created a reasonable doubt that they could exercise independent, disinterested business judgment (*Hamilton* (*cont'd . . .* )

The permissible allegations here do not offer any particularized facts to show that defendants Barnes, Caldwell, Chow, Claflin, Donofrio, and Harding had actual or constructive knowledge of materially misleading statements in AMD's SEC filings, press releases, and public statements.[5] "In the context of a pre-suit demand, directors are entitled to a presumption that they fulfilled their fiduciary duties, and 'the burden is upon the plaintiff in a derivative action to overcome that presumption' with particularized factual allegations." *In re Bidz.com, Inc. Deriv. Litig.*, 773 F. Supp. 2d 844, 850 (C.D. Cal. 2011) (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004)).

Having failed to plead facts showing that a majority of the directors acted fraudulently, knowingly, or in bad faith, the *Hamilton* AC fails to allege a basis for excusing the demand requirement. *See In re Yahoo! Inc. S'holder Derivative Litig.*, 153 F. Supp. 3d 1107, 1120 (N.D. Cal. 2015); *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, No. 17-CV-00162-RS, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) ("a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim," which requires plaintiffs to allege particularized facts showing that the directors engaged in "disloyal," "fraudulent, illegal or bad faith conduct," and "acted with scienter" and "negligent or even reckless conduct is insufficient") (citing *Wood*, 953 A.2d at 141, *McPadden v. Sidhu*, 964 A.2d 1262, 1274-75 (Del. Ch. 2008)). Consequently, based upon the foregoing, the *Hamilton* amended complaint fails to allege demand futility with sufficient particularity and the motion to dismiss on these grounds must be granted.

---

( . . . *cont'd*)
AC ¶ 112(a)), the Court finds that the bare allegation of compensation is insufficient to excuse demand. *See Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by Brehm v. Eisner,* 746 A.2d 244 (Del.2000) (allegations "that directors are paid for their services as directors . . . without more, do not establish any financial interest."); *In re Sagent Tech., Inc., Derivative Litig.*, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003) (demand futility cannot be established merely on the grounds that a director is compensated or would want to preserve their position, otherwise "every inside director would be disabled from considering a pre-suit demand").

[5] While the allegations are sufficiently particular as to the knowledge and participation of defendant Su, who was both a Board member and AMD officer during the Relevant Period (*see Hamilton* AC ¶ 19, 69), particularized allegations as to only one member of the Board is insufficient for demand futility purposes.

### *2. Ha Amended Complaint*

The *Ha* AC relies on two theories of liability: (1) the entire Board, and members of the Audit and Finance Committee in particular, failed to "establish or enforce internal policies" and "failed to disclose the weaknesses in AMD's internal controls leading to the dissemination of misstatements and material omissions" relating to Llano, which exposed AMD to liability in the *Hatamian* action (*Ha* AC ¶¶ 136-141, 147(a)); and (2) a majority of the Board was unable to exercise independent business judgment due to conflicts of interest (*i.e.*, through their employment by AMD, their status as "non-independent" directors, interlocking interests board service and financial payments, business conducted with AMD, service to AMD subsidiary companies such as Advanced Research).  (*Id.* ¶ 147(b).)

Ha's first theory fails for the same reasons that the Hamilton's allegations are insufficient. Ha alleges that Board members were "charged with oversight," or "knew or should have known" of Llano's failures, through their board and/or committee positions.  (*Id.* ¶¶ 107(i), (j), 148-158.) Thus, Ha alleges that a majority of board members "knowingly permit[ted] the making of improper statements in AMD's Forms 10-Q, press releases, and other public statements regarding AMD's business prospects, financial guidance, and comments to financial analysts."  (*Id.* ¶ 108.)

These allegations are insufficient to meet the requirement that plaintiff allege particularized facts as to each member that would establish the knowledge required to create a substantial likelihood of liability.  "To excuse demand based on an asserted *Caremark* claim, Plaintiffs must plead particularized facts to show that '(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring their attention.'"  *In re Yahoo!,* 153 F. Supp. 3d at 1121 n.7 (quoting *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)).  "In either case, imposition of liability requires a showing that the directors *knew* that they were not discharging their fiduciary obligations."  *Stone*, 911 A.2d at 370 (emphasis supplied).  Here, Ha has failed to allege with sufficient particularity that a majority of the board knew they were not discharging their fiduciary obligations.  There are no facts alleged with particularity that give rise to a reasonable inference

that the members of the Board, other than defendant Su, were aware of facts that rendered the SEC filings and public statements materially false and misleading.

Ha's second theory, that board members were conflicted or lacked independence, fails as well. "A director is considered interested where [the director] will receive a personal financial benefit from a transaction that is not equally shared by the stockholders . . . [or] a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales,* 634 A.2d at 936 (citing *Aronson,* 473 A.2d at 812). When such circumstances are alleged, "a director cannot be expected to exercise [] independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Id.* "Independence is a fact-specific determination made in the context of a particular case." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049–50 (Del. 2004). For purposes of demand futility, "plaintiff has the burden to plead particularized facts that create a reasonable doubt sufficient to rebut the presumption" of independence, that is facts that "create a reasonable doubt" as to whether a director is "beholden" to others on the board and could not give unbiased consideration to a demand. *Id.*; *Grobow v. Perot*, 539 A.2d 180, 189 (Del. 1988) (to plead that a director is not independent, plaintiff must allege with particularity that a director was "dominated" or "controlled" by an individual or entity interested in the subject transaction), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000). "[M]ere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004).

Here, Ha alleges that: (1) Su, Yahia, Edelman, and Harding were non-independent directors; (2) Caldwell, Chow, Clafin, Donofrio, Edelman, Harding, Su, and Yahia were governing persons of AMD Advanced Research LLC; (3) Caldwell, Chow, Householder, Inglis, Denzel, and Donofrio were members of the Audit and/or Governance committees; and (4) Yahia, Edelman, Donofrio, and Denzel had a variety of interlocking relationships with other board members or organizations that would have interfered with independent judgment about whether to bring suit in response to a demand. The Court considers each alleged conflict of interest in turn.

### a.      Non-Independent Director Designation

*Ha* argues that four of the eleven AMD directors--defendants Su, Yahia, Edelman, and Harding-- are not considered independent members of the AMD Board, and these allegations are based on AMD's own proxy statement.  A corporation's admission that certain of its directors are not independent is highly probative of whether that director is capable of independently considering a shareholder demand.  *Sandys v. Pincus*, 152 A. 3d 124 (Del. 2016); *Countrywide*, 554 F. Supp. 2d at 1062, 1081 (directors not independent for demand purposes where identified as not independent in proxy statement).  While defendants are correct that being designated as non-independent per the NASDAQ rules for disclosure in SEC filings is not the same as lacking independence for purposes of demand futility, the Delaware courts have recognized that they are closely related, or that being so designated can inform the determination at the demand futility stage.  *Sandys*, 152 A.3d at 131 ("the criteria NASDAQ has articulated as bearing on independence are relevant under Delaware law and likely influenced by our law . . . the NASDAQ rules' focus on whether directors can act independently of the company or its managers has important relevance to whether they are independent for purposes of Delaware law").  However, the fact of their designation, without more, is insufficient to establish lack of independence.

### b.      AMD Advanced Research, LLC

*Ha* alleges that eight of the eleven *Ha* directors (Su, Yahia, Harding, Edelman, Donofrio, Caldwell, Chow, Claflin) are "governing persons" of AMD Advanced Research, LLC.  Ha contends that, because these directors' positions, compensation, and responsibilities as "governing persons" of AMD Advanced Research are undisclosed, their status as "governing persons" is enough to raise an inference that they lack independence to consider a demand against AMD.  Other than alleging that AMD Advanced Research, LLC is a private subsidiary of AMD, the *Ha* AC is devoid of any other factual allegations regarding the business.  (Ha AC ¶¶ 147(b), 148.)

Defendants contend that this allegation is insufficient to indicate that there would be divided loyalties or domination by the AMD executives by virtue of these directors' relationship with a private AMD subsidiary.  The Court agrees.

Ha has not alleged any facts, or offered any argument to suggest that these directors could not make an independent determination as to a demand on AMD beyond the bare assertion that they are also "governing persons" of an AMD subsidiary. "[A] plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling." *In re Bidz.com, Inc. Derivative Litig.*, 773 F. Supp. 2d 844, 853 (C.D. Cal. 2011) (citing *Aronson*, 473 A.2d at 816.) "Demand futility cannot be ple[aded] merely on the basis of allegations that directors acted or would act to preserve their positions" or else "every inside director would be disabled from considering a pre-suit demand." *In re Sagent Tech., Inc., Derivative Litig.*, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003) (citing *Grobow v. Perot,* 539 A.2d 180, 188 (Del.1988), *overruled on other grounds,* 746 A.2d 244 (Del.2000)). In the absence of more particular allegations that these directors' relationship with AMD Advanced Research would create a conflict of interest, or show domination and control by AMD, the Court finds the allegations regarding relationships with this subsidiary to be insufficient to excuse demand.

### c.     *Committee Membership*

With respect to the committee membership, again, the Court finds the allegations insufficient to raise an inference that the board member defendants could not have considered a demand impartially. While it is true that committee members could be charged with a duty to investigate and take action based on that membership, as well as a duty of candor, the allegations of the *Ha* AC are not sufficient to allege knowledge of any false or misleading statements. For instance, the *Ha* AC does not allege that committee members were directly involved in preparation of any financial statements that were materially misleading. *Cf. Rattner v. Bidzos*, No. CIV.A. 19700, 2003 WL 22284323, at *12 (Del. Ch. Sept. 30, 2003) (complaint failed to allege demand futility where it was "wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial information to the market"). In the absence of such knowledge, it is difficult to discern how they could be liable for breaching such duties. In contrast to the cases cited by Ha, such as *Rosenbloom*, *In re Countrywide*, and *In re Wells Fargo*, the allegations here do not provide facts from which the Court can infer that the directors (other

than Su) had knowledge of red flags or warning signs concerning the alleged false and misleading statements. *Cf. In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1063 (C.D. Cal. 2008) ("the facts pled give rise to a compelling inference that Credit Committee members recognized the exponentially rising negative amortization . . . and the yearly doubling and tripling of delinquency rates . . . as serious warning signs . . . . [and] proceeded with deliberate recklessness in the face of these warning signs."); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1093–95 (N.D. Cal. 2017) (complaint alleged "extensive and detailed allegations" that directors knew of the improper account creation scheme and made disclosures in SEC filings that they knew were false or misleading).[6]

### d.    *Other Alleged Interlocking Relationships*

Finally, Ha alleges the following business relationships that he contends would prevent directors from exercising independent judgment:

- Donofrio was on the board of Liberty Mutual Holding Company, which conducted business with AMD; and was a director at the National Association of Corporate Directors ("NACD"), which received payments from AMD. (*Ha* AC ¶ 152.)

- Denzel was a director at NACD, which received payments from AMD. (*Id.* ¶ 153)

- Yahia was a director of both AMD and GlobalFoundries, Inc., and was CEO of Mubadala, a company for which defendant Edelman himself provided senior advisory services. (*Id.* ¶¶ 149, 151.)

The Court agrees that the allegations here do not establish a reasonable doubt as to the independence of these directors. While Ha alleges business relationships between board members, as well as relationships between AMD and organizations for which certain defendants act as directors, there are no specific allegations to suggest how those relationships would have affected

---

[6] To the extent Ha alleges that Board membership alone would have had a different financial interest than the shareholders based solely on the fact of a demand for litigation, that allegation would be insufficient. *See In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 963 (N.D. Cal. 2007) ("Mere membership on a committee or board, without specific allegations as to defendants' roles and conduct, is insufficient to support a finding that directors were conflicted.").

these board members' ability to make an independent decision if presented with a litigation demand. Ha does not meet the burden of pleading particularized facts to show that any of these directors was "beholden," controlled, or dominated by virtue of the alleged relationships. *Grobow*, 539 A.2d at 189; *see also Beam*, 845 A.2d at 1050 (personal friendship or outside business relationship, without more, is insufficient).

### D. Section 14(a) Claims In *Ha* Are Time-Barred

In addition to the demand futility grounds, defendants argue that Ha's claims under Section 14(a) alleged should be dismissed as untimely. Defendants argue that Ha's Section 14(a) claims were not lodged until nearly two years after the first *Hatamian* complaint, which comprehensively disclosed the "occurrences giving rise to" any Section 14(a) claim based on AMD's alleged false statements regarding Llano. The Court agrees.

"The limitations period for a § 14(a) claim is 'one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation.'" *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1212 (N.D. Cal. 2007) (quoting *Westinghouse Elec. Corp. by Levit v. Franklin,* 993 F.2d 349, 353 (3d Cir.1993); *see also Dekalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 409-10 (2d Cir. 2016). "[W]hen the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). Moreover, "[e]quitable tolling will stay the running of the statute of limitations only so long as the plaintiff has 'exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud.'). *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) (quoting *Morgan v. Koch,* 419 F.2d 993, 997 (7th Cir.1969)).

The original *Ha* Complaint, filed September 29, 2015, alleged that AMD's proxy statements should have disclosed "the weaknesses in AMD's internal controls that led to the dissemination of the" allegedly false statements regarding Llano. (*Ha* Complaint, Dkt. No. 1, ¶ 141.) The *Hatamian* complaint put Ha on notice of the alleged misrepresentations sufficient to alert an investor that the proxy statements did not disclose AMD's alleged internal control problems. Ha was on inquiry

notice of concerns from the time that AMD was sued in *Hatamian* (January 4, 2014) and shareholders were notified of the pendency of the litigation in AMD's Annual Report, Form 10-K, filed with the SEC on February 18, 2014.  (Whitworth Decl., *Hamilton* Dkt. No. 62, Exh. 4 at p. 4.)[7]  While the Form 10-K by AMD downplayed the significance of the *Hatamian* suit, it notified investors that the company was alleged to have made "materially misleading statements and/or material omissions by us and the individual officers regarding our 32nm technology and "Llano" product, which statements and omissions, the plaintiffs claim, allegedly operated to inflate artificially the price paid for our common stock during the period." (*Id.*)  That the company offered, in that same 10-K, an unqualified opinion by its auditors that its internal controls were sufficient, was not enough to obscure the alleged fraudulent conduct and to toll the statute of limitations.

As a consequence, the motion to dismiss the Section 14(a) claims is **GRANTED**.

## IV.  CONCLUSION

For the foregoing reasons, the motions to dismiss the *Hamilton* AC and *Ha* AC are **GRANTED WITH LEAVE TO AMEND**.  The Court allows such leave because plaintiffs have not indicated whether they can allege any facts from sources not otherwise covered by the *Hatamian* Protective Order to augment their complaints.

Any amended complaint must be filed no later than **September 11, 2018**.  If an amended complaint is filed, defendants shall file their response no later than **September 25, 2018**.  If no amended complaint is filed, the action shall be dismissed effective **September 12, 2018**.

This terminates Docket No. 61 in the *Hamilton* action (15-cv-1890-YGR) and Docket No. 32 in the *Ha* action (15-cv-4485-YGR).

**IT IS SO ORDERED**.

Date: August 24, 2018

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[7] The Court takes judicial notice of documents filed with the SEC for the fact of their filing, not the truth of the matters stated therein.  The request for judicial notice of this document (Dkt. No. 63) is **GRANTED**.